Please call the first case this morning. Case 5-14-0-4-8-0. Heil, Royster, Voelker & Allen v. Workers' Compensation Comm'n. Counsel, you may proceed. Thank you, your honor. May it please the court. My name is David Green. I represent the appellant employer in this matter. In this matter, I have a slight division problem. So if I squint during the hearing today, don't take it as anything. I was trying a case a while back, and the judge asked if I was squinting at her. So I didn't want to give that impression here. This case arises on an appeal from the Illinois Workers' Compensation decision, which ultimately found for Ms. Petty, the employee, on notice, accident, causal connection, for impartial disability, medical, and physical benefits. The primary issue, however, for purposes of this appeal, is whether Ms. Petty gave notice of her accident under the 45-day jurisdictional rule under Section 6 of the Act, and whether the original decision of the Workers' Compensation Commission, so finding that she did not, was proper. The original decision from the arbitrator found that Ms. Petty gave notice and made reference to an examination by Ms. Petty's IME physician, Dr. David Brown. However, the pertinent facts of this case are that Ms. Petty worked as a legal secretary from approximately 2004 until March 9, 2009. And that's an important date. On March 9, 2009, she was laid off from her employment, as she testified, as a result of a firm-wide action. The layoff didn't have anything to do with her medical condition, or her inability to work, or medical treatment. It was simply a happenstance on March 9, 2009. On April 10th or so, Ms. Petty then files an application for adjustment of claim, alleging carpal tunnel syndrome arising from her work. As of that date, she had not been seen by any doctor.  In fact, she wasn't seen by any physician for her risks, until she was seen by Dr. David Brown, who's an orthopedic surgeon in St. Louis. Dr. Brown saw Ms. Petty on May 5, 2009, and confirmed the diagnosis of carpal tunnel at that time. Keep in mind, however, Ms. Petty had already filed her application in mid-April, about three weeks before she saw Dr. Brown. So the procedural history was, the arbitrator ruled initially in favor of Ms. Petty on the first decision. And the work comp commission, when looking at the facts, the testimony of Ms. Petty at trial, and the sequence of events regarding her termination, the filing of the application, and then about three weeks after that, the diagnosis by Ms. Petty's IME physician ruled that notice was not given within 45 days, it's jurisdictional, no prejudice need to be shown by the employer, and therefore the claim was barred, and they didn't reach any other issues. I think we have a pretty good handle on the facts. So essentially, the commission felt that because she had some reason to suspect that she had carpal tunnel, that got elevated into requirement that she should have given notice at that point. At some point within 45 days of that time, that's correct. Is that consistent with the law? It is, Your Honor. Somebody suspects that they might have it? You have to give notice when you suspect? Under Duran and Peoria County, Bellwood, the standard, of course, is the manifestation date is when the facts of the injury and the causal relationship to that condition would be really apparent to a reasonable person. And the commission applied that standard, and they applied it correctly. And that's a question of fact. When looking at the testimony from the trial, where Ms. Petty testified on cross-examination, that she didn't see any doctors between May 5, 2009 and the May 5, 2009 IME appointment. So there was no additional medical information given to her from the time that she left her employer's employment and the time she filed her application. And then Ms. Petty testifies at trial that, I knew that I had carpal tunnel syndrome. I believed I had carpal tunnel syndrome, and that it was related to my work, at least as of January of 2009. And the commission looked at that, and looked at the further testimony, Ms. Petty, where I asked her, did you know, did you know that you had carpal tunnel syndrome from your work before you saw Dr. Brown on May 5, 2009? Because that was about three weeks after she filed her application. And she replied, absolutely. So to be consistent, the issue is, first on the initial decision, did the commission apply the law of Illinois correctly? And they did. And it was the commission's decision, looking at these facts, that proper notice was not given. That's a factual determination. Unfortunately, on the circuit court level, on the first appeal, the circuit court looked at the facts, and if you look at the circuit court's order, it was a re-weighing of the evidence. And the circuit court says two things in her decision, at the end of the decision. She references the layoff date of March 9, 2009, but there's no additional information given to Ms. Petty as of the layoff date. Is your position consistent with Duran and 3D discount case law, in which it says the courts typically uphold various factors which set the manifestation date as either the date on which the employee requires medical treatment or the date on which the employee can no longer perform work activities? That's a quote from Duran. Did either of those things happen here? No. No, because the date that she could no longer perform her physical activities or work activities wasn't March 9, 2009. The date of loss, the circuit court seemed to have said, and the Second Work Comp Commission said, was the date of loss. That's the point. On March 9, 2009, neither of those things in Duran occurred. Neither of those things in 3D occurred. There wasn't a breakdown of the physical condition to perform the work on March 9, 2009. There was no medical diagnosis on March 9, 2009. Castaneda is almost on point, where Castaneda says, the only thing that occurred, in Castaneda, the employee tried to use the last day of work as the date of loss. And the court in Castaneda said, you can't do that. The only significant thing about the last day of employment in our case, is it happened to be the last day of employment. Therefore, in Castaneda, as in this case, the Castaneda court said, other than the fact that the employee quit working, that date of loss, the last day of employment, has nothing to do with this case. It's not a Duran situation where the employee was confused, or as Duran points out, the employee had equivocal belief as to what condition, if any, the employee had, or that the employee's condition worsened, until the date of loss found in Duran. The court in Castaneda said, you have to get a date of loss as to when the employee, under the BOA standard, when the employee reasonably believed, or a reasonable person would have known, that they had a workers' compensation claim, an injury. And that was not the last day of employment. Same as here. If you take Ms. Petty at her word, where she says, I knew, probably a year before I left the employment, but I knew certainly as of January of 2009, that I had carpal tunnel syndrome. Not that I had problems in my wrists, or that I had trouble sleeping the night, or that I had pain. She's used the word on cross-examination. That's why I moved to amend the pleading form to add notices of defense. She testified, I knew I had carpal tunnel syndrome. The diagnosis. And I also knew that it was work-related, as of at least January of 2009. That was a self-diagnosis. Yes, Your Honor. I mean, no doctor had told her at that point, she had carpal tunnel syndrome. Is that right? That is correct. She hadn't seen any doctor. If she worked in a law office, she'd heard the term, carpal tunnel syndrome, thrown around, I suppose. Presumably, I think there was some insinuation that, in the trial transcript, on her testimony. The point, the relevant point, though, is, she used that term. And the May 5, 2005, appointment with Dr. Brown, which is cited by Ms. Payne and Brief, and by the circuit court on the first commission decision, all that did was confirm a belief. As even Duran says, the test isn't when the condition and the work-relatedness is rarely apparent to a reasonable physician. It's when it's rarely apparent to the employee. And there are cases where the courts have held there's a data loss before the diagnosis is made. And here, there can't be any doubt, in this case, that Ms. Petty believed she had a work-related condition from her employment before a diagnosis, a formal diagnosis, was actually made, because she files her application for adjustment of claim before she sees Dr. Brown, the first doctor who diagnoses the condition relative to this case. So your position is that for proper notice to have been given, it should have been given in January? Yes, Your Honor. I think under the facts of this case, under January of 2009, when she came to the realization that she had a work-related carpal tunnel, she should have given notice at that time. Well, how do you square that with this quote I'm going to give you from Duran? Because you seem to think, and your argument's very cut and dry here, and in those cases they said, an employee who discovers the onset of symptoms in their relationship to the employment, which you're saying clearly happened here, but continues to work faithfully for a number of years without significant medical complications or lost working time, may be prejudiced that the actual breakdown of the physical structure occurs beyond the time of limitation set by statute. Similarly, an employee is also prejudiced in the giving of notice to the employer if he or she is required to inform the employer within 45 days of a definite diagnosis of a repetitive traumatic condition in its connection to the job, since it cannot be presumed that the initial condition will necessarily degenerate to a point which impairs the employee's ability to perform the duties to which he or she is assigned. Requiring notice of a potential disability is a useless act, since it's not until the employee actually becomes disabled that the employer is adversely affected in the absence of notice of the accident. How does that square with your argument that she knew she had carpal tunnel, and that's the ballgame? Because in Durand, the facts in Durand, and as the cases have held on these notice issues, it's very fact-specific to the facts of the case. In Durand, the condition continued to deteriorate. When she first suspected she had a work-related injury, she was unclear as to what the condition was, and her testimony was, as the court realized and pointed out, was that the condition waxed and waned, and her belief was equivocal. And in Durand, the condition continued to deteriorate, and she continued to work. That's not the facts in this case. In this case, there is no evidence that the condition deteriorated, and therefore she quit working on March 9, 2009. If the evidence had been, I agree with that, if the evidence had been that she testified that I knew I had carpal tunnel, and that it was related to my work in January of 2009, but on March 9, 2009, I left work to get surgery, or I left work because I couldn't do the work anymore, I would have a much weaker argument. But nothing occurs then, other than the layoff date. And my position is consistent with Durand, because on the facts that Durand says, you still look at the facts of the case, and when it's really apparent to a reasonable person. And that's why in Durand, it came up with, in Durand it wasn't the last date worked, it was the date of a diagnosis, I believe, in Durand. But in this case, I didn't pick the March 9, 2009 date of loss. Ms. Petty did. She could have picked January of 2009, she could have picked May 5, 2009, she could have, those would have been possible dates of loss, although I think under the facts and evidence of this case, it's clear that January of 2009 is the manifestation date, the proper manifestation date to use. So my position is consistent with Durand in that respect. And as I point out in the brief, in Castaneda, this March 9, 2009 date of loss, which the commission in its second decision, and which was affirmed by the circuit court, has nothing to do here. If this decision is affirmed, then we're saying the date that an employee leaves work for reasons unrelated to the claim, reasons unrelated to the medical diagnosis, the ability to work, or any knowledge the employee has, that can be a date of loss. It would make a quagmire, a jungle of how to determine dates of loss in repetitive trauma cases, and that's important for both parties to know. There has to be some guide rule, there has to be some traffic signals as to how we determine dates of loss for purposes of the 45-day rule, for purposes of statute of limitations. Let me ask you a quick question. Unless you're all in on the notice issue, I'm assuming if we don't accede to the correctness of your position on notice, what about the causation issue? You also had a problem with that. I think it's an agile address in the brief, Your Honor, but briefly, there's two competing medical opinions. One is you have Dr. David Brown, who when he first saw the employee as an IME, not as a treater, so he shouldn't be given deference as a treater, on May 5, 2009. He didn't have any supporting medical records, had nothing. He gave the causation opinion. Yes, Your Honor. And then I have Dr. Richard Howard, who examined the employee, looked over the records, and gave the opinion that it wasn't causally connected. I think that it could be found that the causal connection issue and all the other related issues would be against the manifest weight of the evidence, but obviously the linchpin of this appeal is on the notice issue because the notice issue is reversed. The original circuit court decisions reversed in the original commission decision, which is proper, on the facts, which should not have been reviewed as a factual determination. I'm sorry, as a de novo, should have been reviewed as a manifest weight, would be affirmed. And I ask that it be affirmed. Good. Thank you, counsel. You have time to reply. Thank you. If it may have pleased the court, counsel, good morning. As you've heard, the question today is identifying the manifestation date according to commission decision one. As has been questioned, the question is whether this complies with or is consistent with Durand. And I think commission decision two, as well as the circuit court decision, is completely consistent with Durand, primarily because if you take a look at commission decision one, they're focusing exclusively on when Lisa thought or believed she had a condition without taking into account the second prong of that, of Durand, which says you also have to have an injury and what is defined as an injury. So Mr. Green said what we're looking for really is going to be some traffic sign posts. And I agree. We're looking for objective dates here. We're looking for true dates. He said that if we use the last date of employment, that creates a quagmire. Well, I'm a publisher for a multi-state publication for multi-states. We use that all the time. It's called the last exposure. It's called the date of last injury exposure. Lots of states use it. It doesn't create a quagmire. In fact, just the opposite. It is an objective date. It's a date that you can point to, unlike being able to point to the date she thought or believed she had an injury. That's the quagmire. Even the commission said it's some date in January. They couldn't even give a date. And the interesting part is if they had said, well, January 15, 2009 was it, well, that's only because he had asked the date of January of 2009. If I alleged the date of January 15, 2009, they would have asked her on cross-examination, do you thought or believe it was January 14, 2009? Well, she would have had to say, well, maybe so. Well, now my date's wrong again. Maybe it was December 2008. Maybe it was... What happened on March the 9th? March 9th, 2009. To establish manifestation. It was the date in which she would have last been exposed to the injurious activities of repetitive activities. This is an occupational disease case. Correct. And that's statutorily provided, last date of exposure. You have no last date of exposure language in the Workers' Compensation Act. But in this situation, when I met with her, she came to me saying, I have symptoms that I think are work-related. Did she know it was carpal tunnel? Of course not. She's not a doctor. Did she know it was work-related? Of course not. She's not a lawyer. That leads into my second question. What do we do with a case where someone files an application for adjustment of claim for carpal tunnel before the manifestation date? Because the only date you have here, which she actually found out, was when the doctor you sent her to said she had carpal tunnel. That was May the 5th. That was after the filing of the application for adjustment of claim. And that's because with carpal tunnel cases, they take two routes. The first route is, the injured worker goes to the employer and says, I think I have carpal tunnel. Will you send me to a doctor? That's the way it's supposed to work. Alternatively, it's the date that we, when they say no, we send her to another doctor. Could I have amended to include the date of Dr. Brown's diagnosis? I think I could have. That could have been another traffic signpost, as he says. But in this situation, the purpose behind the manifestation date is to identify the 45-day notice requirement. And in this situation, I could merely assume... You're avoiding my question. If you want to turn around and say, it's not January of 2009, because she merely had a suspicion, then from January 2009 all the way to May 5, 2009, she still only had a suspicion. So there is no manifestation date, but yet you filed an application for adjustment of claim a month before Dr. Brown's opinion, which would have been the manifestation date. So what do we do with a carpal tunnel case that you filed before the manifestation date? Because in our world, what we're saying, as even Duran said, it's an awareness of a potential disability. So she's trying to give notice to her employer as soon as she thinks she's got a work-related condition. Not saying it was. If the doctor came back and said, it's rheumatoid arthritis, it's diabetes, it would have been dismissed. What she's trying to do is give notice, and what we tried to do was to give notice to the employer at the first available date that would have been that traffic sign post. Well, why wouldn't that be January? It wouldn't have been January because nothing happened in January. She was simply working her regular workday. No treatment, no complaints, no limitations. And in fact, as she even testified, her symptoms got worse over March. Here's the problem. We have this gap. We're off out of the workplace because we've been let go, okay? And did she work a full day on March 9th? And she did. Well, what's the difference in the potential then versus the potential in January? What happened to this reasonableness? Did it change? It's not the difference of reasonableness. It's the fact that the condition continued to progress during that time period. So what do we have that it progressed from January to March 9th? As she said, her symptoms worsened. Okay. During that interval of time? During that interval of time. So March 9th is simply... So it made it more reasonable at March 9 than it was in January. Correct. Because the symptoms would have continued to progress. I'm sorry. But March 9th is simply her last day of employment. Correct. The last day of injurious exposure. Well, didn't she also... I'm sorry. Didn't she also testify that she didn't want to take time off work to go to the doctor and have treatment? And then once she was let go, she had time to do that? Correct. Isn't that part of the evidence? Yes, that is correct. That she was saying she was trying to work her full-time job even though the symptoms were progressing. The symptoms were worsening. She did not want to take the time off because she was being a loyal employee? I'm intrigued by this last day of exposure. Where does that fit in the case law in purple tunnel cases? Is there some law that says that? It's the Occupational Diseases Act. It picked it out of the Occupational Diseases Act. There's no place in workers' compensation. Well, when you're dealing with things such as radiation cases and things of that nature as well, they talk about the last day of exposure. Yes, but this is not an occupational... I agree. I agree. Were you implying earlier about multi-states? Yes. That there are some states in the COMP Act itself? Yes. Yes, because when I'm faced with... Not in occupational disease, but in work COMP. In work COMP, yes. Because there are many that say that carpal tunnel isn't an occupational disease. It's a repetitive motion that it is a work COMP, not an occupational disease. And so that's why they... Are you asking us to make new law here? No, what I'm saying, what I'm asking here is when I'm confronted with a person who comes in my office who says, I think I have carpal tunnel, the problem I've got with it is I want to do that same thing that Mr. Green says. I need that objective, definitive signpost. Well, then we're back to my question. Now, why didn't you file the application for adjustment of claim on May the 6th? Because we already... Or the manifestation date of May the 5th. Because then the argument would have been you knew at the time that you left that you had these symptoms. Or it would have been Duran on all fours. But then the other issue would have been if I didn't file the application, how could I have then done the other things, such as requesting medical treatment of the employer, which was the first thing she did. She filed notice and requested that they provide her treatment before we did anything. And so isn't that the purpose of the work COMP Act? For her to go to the employer and say, I think I have carpal tunnel. Will you provide me with medical treatment long before I send her to my doctor? And if that's what we're looking to do here, then there was no other date that I could use besides the last date that she worked. Because she hadn't been diagnosed and wouldn't be diagnosed for months after. And so that's where I'm stuck in a quagmire that I'm trying to figure out, what date do I possibly use? I don't want to use January because that's an amorphous date. It's vague. I don't even know when she would have said if I asked her, when do you first think you knew of this? Well, if she said November, December, well then I'm out of time with notice, but that's different from what Durand is. So you're in a quagmire. I am. I don't know if you're passing a quagmire onto us. So what is the rule of law you would like us to announce in this unusual set of facts? In this situation, Durand and a lot of other cases are talking about it. What they're saying is we're looking for objective guideposts. We're looking for the date that the person was first diagnosed. That's an easy one. But if they've already been diagnosed but they don't think it's work-related and they don't consider it work-related until later, that's a second guidepost. Oscar Meyer actually talked about the last date that the person worked and used that as the date, the last date that they were employed there. So there are other cases that focus on the last date of employment, but because of the fact, as Justice Stewart pointed out, she hadn't yet said, you know, I can't work, and she was laid off before she could actually go to the doctor to determine what the diagnosis was, she could have anywhere along the way, which would have simplified everyone's world here today, but she didn't. So when she came to me, I had to identify an objective date. And I think the last date that she was exposed to the activities, because look at it this way, if she went to a different employer and started doing hand-intensive activities, we would be focusing on how long she was working for that new employer, and the date of employment would have become very relevant to all of this. So that's where I'm saying the last date that she would have been exposed to this becomes relevant, because then the question is, did it deteriorate from the point at which she was last exposed until the time she saw the doctor? So we announce a rule that says the last date of exposure becomes a manifestation date when somebody's let go? Is that what we say? If there's no other objective dates. I would say that it can be one of the objective factors that can be looked at, because the courts have said, we're looking for objective factors here, but we want to be flexible. So if we have no other here, if we don't have a date of diagnosis, we don't have a date of disability, we don't have any of those other factors, why not use this one? It certainly makes sense, because what you're looking at is, has the condition caused it, and to what extent, and when did it stop? Think of it this way. Okay. Absent that, you say the facts in this record support March 9th based upon a progressivity from a January or prior period that would lead a reasonable person on March 9th to proceed with the filing of a claim. Yes. Because of the fact that she had the belief of a potential disability, she provided notice to her employer to try to provide treatment, that could be a reasonable objective date. Not the most ideal, I would agree with you, but certainly a reasonable objective date along those checklists of potential flexible dates that could be used. And you're saying that's consistent with existing law? Yes. I think it's consistent with Durand, Peoria County, Oscar Meyer directly, because that's what they used was the last day of work. So I think that it is consistent with it. And I guess I'm looking at it as, let's take, for instance, a sheet metal worker with a rotator cuff tear. If they have an acromial hook and start doing the overhead work, and after year one they have some mild symptoms but don't tell anyone, well, that's really not the date then, regardless of what they believe, because there's no injury, no diagnosis. You go to date two, now they're having some symptoms but still no treatment. Well, if they're laid off shortly thereafter, isn't the real question, after they're diagnosed, let's say three months down the road, has the condition of that tear progressed? Or was the tear really present there at the time they left? Well, that's kind of what we're talking about here. At the time she left, did she have carpal tunnel? Because, really, that's what they, when you look at the public policy, whenever they're reading all of it, when you're reading all of the cases, they're saying, we're really trying to say as an employer, if you're the one that was really the cause of all of this, let's not nitpick on a believed and try to get to a January amorphous 2009 date. Let's take a look at what are the guideposts, and if the guideposts are date of diagnosis but we don't have it, date of disability but we don't have it, but we do know that on the last day she worked, she testified she was having symptoms and those symptoms had progressed from January until March, why not use that as an objective guidepost? It's better than saying, when do you believe? So this is some sort of, you're asking us to sort of engraph some policy considerations here. We've talked about it, right? I think Duran and Peoria County have already said the policy that I've been saying here. So, I'm sorry, my time is up. Oh, yeah, not yet, not until the red light goes on. And so what I'm simply asking is that by the time it gets to the second commission decision, if they've modified the permanent partial award, it's a manifest wait decision, I don't know that I could ever argue that the modification of their numbers, that I have any evidence to support bringing it back to the original numbers, although I would love to, but I think that those numbers are what they are, so we're simply asking that the second commission decision and the circuit court decision on it be affirmed. Thank you. Thank you, counsel. Mr. Green, you have time in reply. Thank you, John. I looked at trial testimony briefly, quickly, quite frankly. I didn't see any reference to testimony that the condition increased from January of 2009 until March of 2009. Perhaps I missed it or perhaps it's in a medical record, but I didn't see that. I don't recall that from the testimony. I think it's something that should be looked at. It's not my burden to establish data loss, and on the original commission decision, the reason why they didn't say a specific data loss, I believe, is from the testimony of Ms. Petty, who says at trial, I knew I had carpal tunnel syndrome, I knew it was work-related, and I absolutely knew that before I saw Dr. Brown. And so the commission says, based on that testimony from trial, because that was a trial testimony that I elicited from her, that's why the commission said, we're going to say the data loss is sometime in January of 2009, and since the application wasn't filed until April 10 or so of 2009, and she agreed on trial testimony that she didn't tell anyone from Heilroyster about the accident or her condition until after the application was filed, the commission didn't have to say a specific data loss. It was well beyond the 45-day period. It appears as if, in Duran, the court said that the manifestation date is either the date on which the employee requires medical attention or the date on which the employee can no longer perform work activities. Now, on the last part of the statement, can no longer perform work activities, I think an only reasonable understanding of Duran would be can no longer perform work activities as a result of accident. So it is not, I can't perform my work activities because I got fired. So we're back then to the first half of it, and that's the manifestation date is the date on which the employee requires medical attention. In this case, there was no medical attention until after the application adjustment claim was filed. So what do we do with a case that's filed a month before the manifestation date? I don't think you can count notice at that time of the manifestation, of a manifestation date if the employee is claiming another data loss. But under the White decision, Your Honor, you can have, the White case did say you can have a manifestation date after the cessation of employment. In White, that was when the employee was diagnosed in the commission, the court said. I don't dispute the fact that you can have a manifestation date after this person no longer works for the employer. But my question is, can you have a manifestation date after the filing of the application for adjustment claim? I don't think you can. It doesn't make any sense. Well, I know it doesn't make any sense, but the fact of the matter is you got a woman who has carpal tunnel, and you got causation opinions that are related to her employment. Unfortunately, we've got an application for adjustment of claim that appears to have been filed a month before the manifestation date. But I think the question, I think that question begs the question, which is then it's not the manifestation date. Then unless there's something that changes. Unless one takes the position that if an employee is possessed of sufficient knowledge that she has a work-related injury to file an application for adjustment of claim, the manifestation date is the date of the filing of the application of adjustment claim. Because you can't deny then that a reasonable person would not be of the opinion that their injury was work-related or she shouldn't have been filing an application for adjustment of claim. I think that's exactly right. But then you have to look at the facts and cases of when did the employee actually come about with this information? And I think that's what the commission did here because of this factual scenario where she files the application prior to the diagnosis. From the record, I find no difference between what she had in January when she said she suspected it all the way up to May when the doctor told her she had carpal tunnel. There's no evidence in this record of any increased symptoms that caused her to seek medical treatment or that she should have sought medical treatment but didn't. I don't think there is any difference. And that's why the commission came up with the January of 2009 date of loss because even under Durand, Durand was saying these are events which can establish a manifestation date. Well, the problem with Durand is, remember something, the Supreme Court and Durand reversed the commission. The commission found a manifestation date based on her subjective belief that she had the condition that she'd been told about. And the Supreme Court rejected it. And they said no and they took it away from the commission, although professing that the question of manifestation date is a question of fact for the commission. So I don't know how you develop a rule out of Durand. The way I read Durand is you can have more than one manifestation date in a repetitive trauma case, it seems to me, is what Durand was saying. But any manifestation date that's established, there has to be something which is associated with the claim. And Castaneda speaks directly to it and no other case. Castaneda says the date the employee is laid off isn't the date of loss. It's clear. And there's no other case that I found in Illinois that says the date of loss can be when you're laid off. That's what's here. And that's the problem we have. And that's why the date of loss cannot be accepted. That's why the commission's decision is correct. Okay. Thank you, counsel. Time is up. Thank you, counsel, both for your arguments in this matter. We'll take them under advisement. The written disposition shall issue. Please call the next case.